AO 91 (Rev. 11/11) Criminal Complaint

**FILED**
6/30/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Michael Toogun (312) 886-1265

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 26CR349 |
| v. | |
| WILLIAM THOMAS, <br> also known as "T" | **UNDER SEAL** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 16, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Did knowingly and intentionally distribute a controlled substance, namely, 40 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Donald Adams*

DONALD ADAMS
Special Agent, Homeland Security Investigations (HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: June 30, 2026

*Judge's signature*

City and state: Chicago, Illinois

Laura K. McNally, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, DONALD ADAMS, being duly sworn, state as follows:

1.      I am a Special Agent with the Homeland Security Investigations (HSI) and have been so employed since September 2024.  As part of my duties, I am currently assigned to HSI Chicago Gangs and Violent Crimes Task Force (GVCTF). My current responsibilities include the investigation of criminal violations relating to violent crimes, including, among others, narcotics and the apprehension of violent fugitives.  I have participated in the execution of multiple federal search warrants.

2.      This affidavit is submitted in support of a criminal complaint alleging that WILLIAM THOMAS ("THOMAS"), also known as T, has violated Title 21, United States Code, Section 841(a)(1).  Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging THOMAS with distribution of a controlled substance, namely, 40 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.      This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, consensually recorded communications,

recordings of controlled transactions involving THOMAS, my experience and training, and the experience of other law enforcement agents.

## I. FACTS SUPPORTING PROBABLE CAUSE

### A. Summary of Probable Cause

4.      Since approximately September 2024, law enforcement, including HSI, the Chicago Police Department ("CPD"), and the Internal Revenue Service – Criminal Investigation (IRS-CI) have been investigating a drug trafficking organization ("DTO") that distributes narcotics on the west side of Chicago, including near the intersection of W. Chicago Ave. and N. St. Louis Ave.  Between January 2025 and July 2025, law enforcement officers ("LEOs") have conducted several controlled purchases of heroin, fentanyl, or a heroin and fentanyl mixture from THOMAS, one of which is described in detail below, in and around the west side of Chicago.[1] Through physical surveillance, surveillance of pole and police observation device ("POD" footage (and collectively, "electronic surveillance")), and other investigative means, law enforcement has identified THOMAS as a seller of narcotics on the west side of Chicago.

5.      As further described below, between January 2025 and July 2025, HSI and the CPD conducted no less than eight controlled purchases of narcotics from THOMAS.  The substances obtained from THOMAS on these occasions were either submitted to the United States Customs and Border Protection Laboratory or the

---

[1] The instant affidavit does not describe every controlled purchase law enforcement has conducted with THOMAS in 2025.

Illinois State Police (ISP) Laboratory. Subsequent lab testing of the substances obtained from THOMAS during these transactions indicated the presence of heroin and fentanyl, heroin, or fentanyl.

6. As explained below, on or about May 16, 2025, law enforcement facilitated a controlled narcotics purchase during which an Undercover Officer ("UC-1") purchased approximately 43.6 grams of a mixture or substance, excluding packaging, a sample of which contained fentanyl, from THOMAS. With respect to the May 16, 2025, transaction, and as described below, THOMAS directed UC-1 to a prearranged meeting location at which THOMAS and UC-1 arrived to conduct the transaction. As described more fully below, UC-1 met with THOMAS, whereupon UC-1 provided approximately $800 in exchange for approximately 43.6 grams of suspect narcotics, excluding packaging. Subsequent lab testing of a sample of the suspect narcotics confirmed the presence of fentanyl.

**B. Thomas**

7. During law enforcement's investigation of the DTO, on or about January 23, 2025, law enforcement successfully used a registered confidential source ("CS-1") to introduce UC-1 to THOMAS.[2] Based on information provided by CS-1, law

---

[2] This affidavit does not describe every communication between THOMAS and UC-1 or THOMAS and CS-1. My descriptions of certain recorded communications are summaries of the communications and may not include the entirety of the communications. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review and draft transcripts of the recorded conversations and not on final transcripts of the recorded conversations. These summaries and excerpts do not necessarily include all statements or topics discussed during the course of the recorded conversations, nor do quotes summarized in succession necessarily reflect all statements made between the quotes. Any times listed for communications are approximate. At various points in the affidavit, I have included, either in brackets or

enforcement believed THOMAS had an active role in selling narcotics on the west side of Chicago.[3]

8. According to CS-1, CS-1 previously observed THOMAS personally in possession of controlled substances, including heroin, and CS-1 conducted narcotics-related conversations with THOMAS, both in person and over the phone. According to CS-1, THOMAS previously provided CS-1 with the telephone number (XXX) XXX-7300 ("Subject Phone 5") as THOMAS's telephone number. During this investigation, LEOs obtained a Federal Pen Register on Subject Phone 5.[4] According to CS-1, CS-1 is familiar with THOMAS and THOMAS's appearance. Additionally, CS-1 has identified THOMAS based on a photograph obtained from a law enforcement database.

9. On or about January 23, 2025, LEOs observed THOMAS arrive in the parking lot of a grocery store located at 2333 W. Madison Street, in a black 2018 Dodge Durango bearing Illinois license plate, DT15721 ("Subject Vehicle 1"), and

---

[3 footnote continuation] summary form, my interpretation of words and phrases used in the recorded communications. My interpretations are based on the contents and context of the recorded communications, events occurring before and after the communications, my knowledge of the investigation as a whole, my experience and training, and the experience of other law enforcement agents.

[3] In summary, CS-1 began cooperating in this investigation in approximately October 2024, and has multiple arrests and convictions, including a felony conviction for narcotics possession. The information provided by CS-1 was corroborated and proved reliable by other cooperating witnesses, physical surveillance, telephone records, and other publicly available records, as well as audio/video recordings. CS-1 is cooperating in this investigation in potential consideration on a pending narcotics investigation and payment. To date, CS-1 has been paid $265, and no further promises have been made regarding any potential benefit he/she may receive for his/her cooperation, including any specific promises of leniency.

[4] On or about December 20, 2025, Chief Judge Virginia M. Kendall signed a Federal Pen Register on Subject Phone 5 in this investigation.

observed THOMAS engage in a controlled narcotics transactions with CS-1 and UC-1.

10. On or about January 29, 2025, United Stated Magistrate Judge Heather K. McShain signed a warrant and order authorizing the installation and monitoring of a tracking device on Subject Vehicle 1 for a period of 45 days. The monitoring period expired on or about March 14, 2025.

11. On or about March 14, 2025, Magistrate Judge McShain signed a warrant and order authorizing the continued monitoring of a tracking device on Subject Vehicle 1 for a period of 45 days. This monitoring period expired on or about April 28, 2025.

12. Pursuant to the investigation, LEOs observed THOMAS continue to utilize Subject Vehicle 1 in furtherance of narcotics trafficking activity, and on or about May 12, 2025, Magistrate Judge Jeffrey T. Gilbert signed a warrant authorizing the installation and monitoring of a tracking device on Subject vehicle 1 for a period of 45 days. This monitoring period expired on or about June 26, 2025.

13. For purposes of further identification of THOMAS in this affidavit, UC-1 can identify THOMAS's voice and face. Specifically, including the May 16, 2025, purchase described below, UC-1 has personally interacted with THOMAS on multiple occasions and conducted controlled purchases of heroin, fentanyl, or a heroin and fentanyl mixture from THOMAS, multiple times, including on the following dates and in the following approximate amounts, inclusive of packaging, in and around the west side of Chicago:

| January 23, 2025 | 29.1 grams |
| February 21, 2025 | 12.8 grams |
| February 26, 2025 | 26.7 grams |
| April 24, 2025 | 51.7 grams |
| April 30, 2025 | 38.7 grams |
| May 16, 2025 | 65.6 grams |
| May 31, 2025 | 26.2 grams |
| July 2, 2025 | 51.3 grams |

**C. May 16, 2025, Controlled Purchase of Narcotics from THOMAS**

14. On or about May 7, 2025, at approximately 11:34 a.m., UC-1 received an incoming text message from Subject Phone 5 utilized by THOMAS. The text messages stated "Yooooo," "I got some action!" "I got a sample for you" "Come get it." On or about May 8, 2025, UC-1 replied to THOMAS, via Subject Phone 5, that he had been busy with work and would try to meet up with THOMAS in the next few days. On or about May 13, 2025, at approximately 12:07 p.m., UC-1 sent an outgoing text message to Subject Phone 5, utilized by THOMAS. In summary, UC-1 asked if THOMAS would be around on Friday, May 16, 2025, and requested to purchase "seven" from THOMAS, by which UC-1 meant UC-1 was requesting to purchase seven (7) packs.[5] UC-1 wrote "Yo I got enough for 7 but its gotta be a full 7 can't be lite." THOMAS responded that "Believe me when I tell you it's gonna be everything you wished," and confirmed that Friday, May 16, 2025, at noon is "perfect" for the transaction.

15. On or about May 15, 2025, at approximately 2:56 p.m., UC-1 received incoming text messages from Subject Phone 5 utilized by THOMAS. The text

---

[5] Based on my knowledge of the investigation to date, my training and experience, I believe a pack to be approximately 10-14 individual bags of heroin.

messages stated "Yoooo" "We still on for tomorrow noon??" UC-1 responded that he was still driving and asked if THOMAS would have "the full 7." THOMAS replied that "I have it ready for you now…I'll meet you at the spot." UC-1 confirmed that he would see THOMAS "at the spot at 12 tomorrow," by which, according to UC-1, UC-1 interpreted as a location near where UC-1 made previous controlled purchases from THOMAS. On May 16, 2025, UC-1 and THOMAS exchanged the following text messages:

| THOMAS: | Yoooo |
|---|---|
| THOMAS: | Bring me 800…. I'm goin to have you 9 whole ones and some extra |
| UC-1: | Man if I can get that extra I will I got 7 now let me see |
| THOMAS: | Bet |
| THOMAS: | I'm ready for you |
| UC-1: | Yo ill be there around 130 that cool? |
| THOMAS: | Ok cool |
| UC-1: | Got the extra 100 be there in like 15 |
| THOMAS: | Bet |
| THOMAS: | Park more towards the expressway not in the same spot |
| UC-1: | Here near the vacant lot |
| THOMAS: | Ok…I wat you to park on the next block over…310 s Maypolewood |
| UC-1: | Ite [alright] parked up |
| THOMAS: | Bet |

7

| THOMAS: | Give me til 1:25-1:30 (100 100 100 emoji) |
| UC-1: | Ite [alright] |
| UC-1: | Yo u close my boss is already looking for me |
| THOMAS: | 5mins |
| THOMAS: | I was in traffic |
| UC-1: | K |

16. At this time, law enforcement established both mobile and electronic surveillance at or near the 300 block of S. Campbell Ave., Chicago, Illinois.

17. At approximately 1:01 p.m., UC-1 arrived in the area of 309 S. Maplewood Ave., Chicago, Illinois, which is approximately one block from the 300 block of S. Campbell Ave.

18. At approximately 1:38 p.m., according to UC-1, UC-1 observed Subject Vehicle 1 park across the street from UC-1. THOMAS then exited Subject Vehicle 1 and entered the passenger side of UC-1's vehicle. According to a video recording of the transaction from UC-1's undercover recording device, UC-1 and THOMAS exchanged greetings. Then, THOMAS pulled from his pocket a multi-colored zip lock bag containing smaller, clear zip lock bags, each of which contained a white powdery substance. A later count of the smaller, clear zip lock bags totaled approximately 90, each containing a white powdery substance.

19. According to a video recording of the transaction from UC-1's undercover recording device, THOMAS explained to UC-1 what was inside the multi-colored bag. THOMAS related to UC-1, in summary, that there were nine larger clear zip lock

bags each containing ten smaller clear zip lock bags. THOMAS also said that the smaller bags contained "that gray shit you gonna fall in love with that."

20. Immediately following the controlled purchase, at a predetermined location, UC-1 transferred the custody of approximately one multi-colored zip lock bag containing approximately nine larger sized clear bags, each containing approximately ten smaller bags for a total of 90 bags. Later analysis by an ISP laboratory of a sample of the substances contained in the 90 bags confirmed the presence of fentanyl and that the substance weighed approximately 43.6 grams, excluding packaging.

21. Based on the foregoing, I respectfully submit that there is probable cause to believe that on or about May 16, 2025, THOMAS distributed a controlled substance, namely, 40 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II Controlled Substance.

FURTHER AFFIANT SAYETH NOT.

*Donald Adams*

DONALD ADAMS
Special Agent
Homeland Security Investigations

SWORN TO AND AFFIRMED by telephone June 30, 2026.

*Laura K. McNally*

Honorable LAURA K. McNALLY
United States Magistrate Judge

9